USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/10/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOHEGAN LAKE MOTORS, INC.,

                    Plaintiff/Third-Party Defendant

    -against-

THOMAS MAOLI, and CELEBRITY AUTO of
MOHEGAN LAKE, LLC,

                 Defendants/Third-Party Plaintiffs
    -against-

BARRY ROST and WILLIAM ROST
               Third-Party Defendants.

No. 16-CV-6717 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

In 2015, Mohegan Lake Motors, LLC ("Mohegan"), owned by Barry Rost (individually "Rost") and his brother, William Rost (together with Barry Rost, "the Rosts") entered into a contract with Celebrity Auto of Mohegan Lake, LLC ("Celebrity"), a company formed by Thomas Maoli ("Maoli") to buy Mohegan's car dealership. After months of due diligence, which Celebrity extended twice, Celebrity sent a notice of termination. Mohegan filed this diversity action asserting, *inter alia*, contract and fraud claims against Celebrity and Maoli (collectively, "the Buyer" or "the Purchaser").[1] The Buyer asserts counterclaims against Mohegan and third-party claims against the Rosts (together with Mohegan "the Seller") for breach of contract and contractual indemnification.  (ECF No. 80.) Before the Court are the Buyer's motion for summary judgment (ECF No. 105) and the Seller's cross-motion for summary judgment (ECF No. 112).

---

[1] The Court previously dismissed Mohegan's claim for breach of the covenant of good faith and fair dealing. (ECF No. 35.)

For the following reasons, the Court DENIES the Buyer's motion as to the Seller's alter ego liability, fraudulent inducement, and breach of contract claims and GRANTS the Seller's cross-motion, dismissing the Buyer's breach of contract claim.

## BACKGROUND

The facts in this section are drawn from the Buyer's Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("SUMF" (ECF No. 107)), the Seller's Response to the SUMF ("RSUMF" (ECF No. 108)), the Seller's Statement of Undisputed Facts in Support of its Cross-Motion for Summary Judgment ("CSUMF" (ECF No. 114)), the Buyer's Response to the CSUMF ("CRSUMF" (ECF No. 119)), the Declaration of Marc Gross in Support of the Buyer's Motion for Summary Judgment ("Gross Supporting Decl." (ECF No. 121)), the Declaration of Jarod Taylor in Opposition to the Motion for Summary Judgment ("Taylor Opp'n Decl." (ECF No. 110)), the Declaration of Barry Rost in Opposition to the Motion for Summary Judgment ("Rost Decl." (ECF No. 111)), the Declaration of Thomas Maoli in Opposition to the Seller's Cross-Motion for Summary Judgment ("Maoli Decl." (ECF No. 117)), Jarod Taylor's Declaration in Support of the Seller's Cross-Motion for Summary Judgment ("Taylor Supp. Decl." (ECF No. 115)), and corresponding exhibits. Facts are undisputed except where indicated.

## I.    Factual Background

### A.    Undisputed Facts Regarding the Transaction

Rost owns the Mohegan Audi dealership ("the Dealership") and some of the real estate upon which the Dealership operates with his brother, William Rost.

Maoli owns and operates a number of car dealerships under various entities including Celebrity Motorcar ("Maoli Dep. Tr." at 106 (ECF Nos. 110-1, 115-3)), Lexus of Route 10, Maserati of Morris County, BMW of Springfield NJ, and NMK SAAB (*see* ECF No. 110-28 email signature block for Maoli indicating that he is "Dealer Principal" of the aforementioned entities).

In or about 2014, Rost decided to sell the Dealership, engaged a broker—Tony Assalone ("the Broker")—to market the Dealership and find a suitable buyer, and authorized Audi to find buyers. ("Rost Dep. Tr." at 59, 72, 74, 78 (ECF Nos. 110-2, 121-1); *see* SUMF ¶ 1; RSUMF ¶ 1.) At the time, Rost had health issues and did not have the funds to improve the Dealership to meet Audi's requirements. (Rost Dep. Tr. at 59-60.)

The Broker brought the deal to Maoli, with whom he had a prior professional relationship. ("Assalone Dep. Tr." at 94-96 (ECF Nos. 110-3 and 121-14); *see also* Rost Dep. Tr. at 82-83, 89). Around June 2015, Rost and Maoli began discussing the potential sale of the Dealership. On June 16, 2015, in connection with the potential transaction, Maoli formed Celebrity of Mohegan Lake ("Celebrity"), a New Jersey limited liability corporation ("LLC"), of which he was the sole member. ("Formation Cert." (ECF No. 110-20, 121-2); *see* SUMF ¶ 2; RSUMF ¶ 2.) Celebrity was assigned an employer identification number by the Internal Revenue Service ("IRS Letter" (ECF No. 121-3), but Celebrity never had any employees (Maoli Dep. Tr. at 109). Celebrity has an undated operating agreement signed by Maoli indicating that Celebrity is an LLC, that Maoli is the sole member with a 100% ownership interest. (ECF No. 110-21.)

On June 19, 2015, Celebrity and Mohegan executed a non-binding letter of intent ("LOI"). ("LOI" (ECF Nos. 110-11, 121-5); *see* SUMF ¶ 4; RSUMF ¶ 4.)

As early as July 2015, Maoli was in conversations with Audi regarding the financing of upgrades that would be required at the Dealership. (Maoli Dep. Tr. at 134-35; "July 9, 2015 email from Maoli to Rick Fuller" (ECF No. 110-27).)

On August 19, 2015, an Order was entered in Maoli's divorce proceeding enjoining him from acquiring or selling any further business, or real or personal property during the pendency of

the divorce action unless agreed to by the parties with court approval (the "Injunction"). ("Injunction" (ECF Nos. 110-17, 121-8); *see* SUMF ¶ 11; RSUMF ¶ 11.)

On or about October 16, 2015, Mohegan and Celebrity entered into a written asset purchase agreement ("APA"), pursuant to which Celebrity agreed to purchase certain enumerated assets of the Dealership. ("APA" (ECF Nos. 115-1, 121-6); *see* SUMF ¶ 6; RSUMF ¶ 6; CSUMF ¶ 1; RCSUMF ¶ 1.) Though the agreement was signed on or about October 16, 2015, the parties agreed to postdate it to November 10, 2015, the date by which Maoli expected his divorce to be concluded. (SUMF ¶ 9; RSUMF ¶ 9.) In an email to his attorney dated October 16, 2015, Rost explains

> What we have is a postdated agreement signed by [Maoli], because he is in the midst of a divorce and he expects it to be concluded before Nov. 10 . . . which is the date he signed the agreement for.[2]
>
> Next he says he is sending an Escrow Check to Bob Bass for the deposit of $500,000 which I assume is also postdated. Obviously, not where I want to be . . . not what I expected. However, I still believe he is a real buyer . . . . Now for the major hurdle and I don't know if we should wait to see if we have a bona fide deal or act on it now.
>
> [Maoli] says he cannot provide a personal guaranty for the $2.5 mil that I am carrying as a result of his divorce and that he can't show the liability. This is totally a dealbreaker, unless you get together with Bob Bass and can get me a guaranty from Lexus Rt. 10, that is the entity of Lexus Rt 10 that segregates the $2.5 mil so that it is not encumbered . . that's the jailhouse lawyer in me. I really don't want or need anyother [sic] surprises.[3]
>
> I don't whether [sic] you should act on it now . . though I think we should and what course to take. Tom "assures" [the Broker], that he will come up with a guaranty that will put any fears I have to rest . . . .

---

[2] None of the filings address when Maoli's divorce was concluded and the injunction lifted.

[3] Rost avers that "the parties contemplated that $2.5 million of the $8 million purchase price would be in the form of a loan from Mohegan to Celebrity in exchange for a note of the same amount with a three-year repayment period. In that event, Celebrity would possess both the business and would retain $2.5 million of the $8 million purchase price. Ultimately, the parties agreed that Celebrity would pay the full $8 million purchase price at the closing. Mohegan therefore no longer needed a guaranty for the $2.5 million since it was no longer going to be held back." (Rost Decl ¶ 11.)

("APA Email" ECF Nos. 110-7, 121-7.)

      *B.     Disputed Facts Regarding Disclosures*

      Maoli testified that prior to signing the LOI and the APA, he disclosed to the Seller that in order to consummate the transaction Maoli would either need his divorce to be concluded or he would need to get approval from the divorce court. (Maoli Dep. Tr. at 65-67, 83-84, 142, 175.) He further testified that Section "4.2(e) is in the contract" because he disclosed the pending divorce to the Seller. (Maoli Dep. Tr. at 171.) Maoli explained that Section 4.2(e) is "a condition of my obligation to close," (Maoli Dep. Tr. at 171) which "basically says that [the injunction] needs to be lifted" in order for the transaction to go through (Maoli Dep. Tr. at 174).

      Rost testified that prior to signing the APA he knew that Maoli was "in the midst of a divorce," which he initially learned from the Broker (Rost Dep. Tr. at 159), and that he knew Maoli "expects [the divorce] to be concluded before Nov. 10 . . . which is the date he signed the agreement for," (APA Email); Rost Dep. Tr. at 219; *see* SUMF ¶ 8; RSUMF ¶ 8.) Rost insists that Maoli never informed him that Maoli, and consequently Celebrity, was enjoined from entering into the sale prior to the conclusion of divorce proceedings without court approval. (Rost Dep. Tr. at 220-21; Rost Decl. ¶ 2 ("At no time did Thomas Maoli ever tell me that there was an injunction issued by any court that prohibited or in any way restricted Maoli's ability to enter into a contract for the purchase of any business or any assets.").) Rost did not make inquiries regarding Maoli's ability to consummate the transaction prior to entering into the APA. (Rost Dep. Tr. at 330; Rost Decl. ¶ 4 ("I did not review the records of New Jersey's family courts before entering into the APA because it did not occur to me that a family court judge would have issued an injunction against Maoli personally that would prevent or impede this transaction."). Rost further testified that he did not learn about the divorce court's injunction until after the transaction was terminated (Rost Dep.

Tr. at 309; Rost Decl. ¶ 5 ("I first learned of the existence of this injunction from my litigation counsel after Maoli terminated the APA. I do not know how he obtained the injunction").)

The Broker also testified that while he was aware of Maoli's ongoing divorce, Maoli never told him that he was enjoined from closing on a car dealership without court approval during the pendency of the divorce. (Assalone Dep. Tr. at 287-88.) The Area General Manager at Audi who was involved in the transaction also testified that he was aware that Maoli's divorce was making it hard for Maoli to do business but was unaware that any injunction existed. ("Fuller Dep. Tr." at 79, 200 (ECF No. 110-14).)

Rost avers that he "would not have entered into the LOI or the APA had [he] been told about [the] injunction [against Maoli]." (Rost Decl. ¶ 6.)

C.      *Undisputed Facts Regarding the Escrow Check*

Pursuant to the APA, the Buyer was to place a $500,000 deposit in escrow within 3 days of the effective date. (APA at 12.) The escrow agent is identified as Bass Sox Mercer, Attention: Stuart Rosenthal. (APA at 3.)

On November 10, 2015, Maoli made out a check in the amount of $500,000 to Bass Sox Mercer Attorney Trust Account, which notes in the memo line "Purchase of Mohegan Lake Motors." ("Escrow Check" (ECF No. 110-12).) Maoli testified that it appears this check was made out from his personal account. (Maoli Dep. Tr. at 176-177.) Rost attests: "I believed that the escrow payment had been deposited with the escrow agent, Stuart Rosenthal of Bass Sox Mercer, because Maoli provided me a copy of a check that was made out to escrow." (Rost Decl. ¶ 8.)

On November 23, 2015, Gary Gabriele, who worked for Maoli and was listed as the authorized agent of Celebrity, emailed Elaine Keifrider, the executive assistant at Lexus of Route 10, stating with reference to the escrow check "I don't believe I wrote this check out, nor is it showing as cashed in the bank (or monies put in to cover it). Is this a legitimate check? My records

6

are not in balance. If it has to be covered, let me know from where to pull the monies." Keifrider responded "[Maoli] had me do the check but the check was never sent." (ECF No. 110-15.)

In May 2016, Buyer's counsel emailed Celebrity's termination notice to Seller's counsel and the Escrow Agent, copying Maoli. ("Emails Re Return of Deposit" (ECF No. 110-16).) Seller's counsel responded to all but Maoli stating "I received an email from [the Escrow Agent] that the deposit was never paid to him. Where is the deposit?" On May 7, 2016, [the Escrow Agent] responded to the group stating "Just to be clear, please be advised that I am unequivocally stating and representing to you that *I have never received any funds* as an escrow agent or otherwise *with regard to this matter*." (*Id.* (emphasis in original).)

### D.    Undisputed Facts Regarding the Due Diligence Period

On or about December 3, 2015, Maoli opened a bank account for Celebrity at Valley National Bank. ("Valley National Bank Account" (ECF No. 110-13).)

On December 4, 2015, the Broker alerted Maoli by email to tmaoli@lexusofroute10.com that Mohegan's financial statements appeared to be missing $300,000 in profit. (ECF No. 110-28.) Maoli copied Gabriele and Keifrider, both of whom had email addresses at lexusofroute10.com, on his acknowledgement of receipt email. (*Id.*) By email dated February 4, 2015, Rost explained to the Broker: the "year end statement . . . . includes a $300,000 charge up for LIFO adjustment (good faith estimate). But . . . I deferred $325,000 of Audi incentives for last quarter (NOT STANDARDS) and $67k from third quarter." ("Feb. 4, 2016 Email from Rost to Assalone" (ECF No. 110-29); *see also* Rost Dep. Tr. at 224-25.)

On January 5, 2016, Celebrity requested a 60-day extension of the due diligence period through March 8, 2016. ("January Extension Letter" (ECF Nos. 117-1, 121-9).) This letter does not provide any reason for the extension and merely states that if the Seller does not agree to the extension, the Buyer will terminate the Agreement and be entitled to refund of its deposit. (*Id.*) On

January 5, 2016, Mohegan agreed to extend the Due Diligence period for 60 days. (*Id.*; *see* SUMF ¶ 16; RSUMF ¶ 16.) By email the following day, Rost wrote to his attorney: "I spoke to Tom Maoli yesterday and as the drop dead date of the original contract was January 7, 2016, he wanted an extension . . . to which I agreed . . . . he said . . . that the full package was submitted to Audi on Friday of last week and I believe that Audi is entitled to take up to 60 days for approval . . . ." ("Email from Rost to Counsel re January Extension" (ECF No. 110-5).) Rost consentend to the extension requested by returning a signed version of the extension letter. (January Extension Letter.)

One of Maoli's staff—possibly the Director of New Franchise Development for Lexus of Route 10 and Maserati of Morris County—emailed Maoli on February 3, 2016 relating a message from Audi Financial regarding the opening of the Hawthorne Point Audi. (ECF No. 110-26.) Rost testified that the Hawthorne Point location is about 20 miles from the Dealership, opened in approximately October 2017, is the closest competitor of the Dealership, and that while the existence of Hawthorne has enhanced Mohegan's reputation because Mohegan is more proficient in sales and service, Hawthorne's existence has decreased Mohegan's profits because Mohegan has to lower its prices to match those at Hawthorne. (Rost Dep. Tr. at 50-53.)

By email dated February 23, 2016, the Area General Manager at Audi emailed Maoli to schedule a meeting for Maoli with Audi Executives in Virginia on March 21, 2016, stating "I need a firm commitment for you on this as we will not be able to cancel on them again" and also noting that Audi still needed certain documents from Celebrity. ("Emails re Audi Meeting" (ECF No. 110-19).) Maoli responded that March 21, 2016 was not possible since he would be on a pre-planned family vacation out of state at that time. (*Id.*)

On March 4, 2016, Celebrity requested another 60-day extension of the Due Diligence Period through May 7, 2016. ("March Extension Letter" (ECF Nos. 117-2, 121-9).) As with the first extension letter, this letter does not provide any reason for the extension and merely states that if the Seller does not agree to the extension, the Buyer will terminate the Agreement and be entitled to refund of its deposit. (*Id.*) Maoli testified that in March or April 2016 he verbally asked for an extension of due diligence because his divorce was not final. (Maoli Dep. Tr. at 279-80.) When Seller's counsel emailed Maoli (at his Route 10 Lexus email address) and his attorney to ask why they needed the extension if the application to Audi is complete, Maoli stated that they did not have Audi approval yet and "[w]e do not have our arms around [t]he building issues." ("Email Re Reason for Extension" (ECF No. 110-6).) Seller consented to the extension by signing the extension letter. (March Extension Letter).

Rost avers that he "would not have agreed to any extension of the closing under the APA had [he] been told of the injunction." (Rost Decl ¶ 7.)

E.     *Undisputed Facts Regarding the Dissolution of the Transaction and Discovery of Buyer's Failure to Make Deposit*

Rost testified that he did not become aware that Maoli's "personal issues" were delaying closing until Audi informed him of this fact. (Rost Dep. Tr. at 219.)

On April 10, 2016, Rost emailed his attorney and the Broker stating, in relevant part:

[Maoli] has informed [the Broker] that he is experiencing a problem with Audi Financial in approving his package as he claims they have changed the terms of his financing to reflect a "necessary change in the pro-forma" as a result of the inclusion of a new Audi dealer in Hawthorne. Because of this change, he decided to cancel his face to face with Audi management (which they want before granting approval) until they gave him the original agreed upon terms. If this is truly the case, it is going to once again delay any possible closing. Additionally the buyer has real and significant personal issues that is causing him distractions, which has and will continue to further delay any closing.

I have been most reasonable in accommodating his situations, but I have exhausted my patience and need closure.

> Along the way (last month), he informed me that he does not want the VW franchise at all even at no cost, but he does WANT to assume the VW building at the time he takes on Audi. I understand that view. This brings me to my points.
>
> A- I want certainty and to that end, I propose that the $500,000 deposit immediately become non-refundable and transfer to me as a condition for continuing to wait. It would of course be a credit at closing. I would like that without any contingencies in recognition for the extended wait I have endured and the compromises in rent, real estate price, termination of VW etc. I would give him for that consideration, up to six months  additional to  close the deal.  However, I  do believe  that  he still wants to proceed, but he is even more distracted than usual . . . .

("Apr. 10, 2016 Email between Rost and Counsel re Further Delays" (ECF No. 110-31).) On April

20, 2016, Rost emailed the Broker stating in relevant part:

> I just want to clarify some points that I would like you [sic] consider regarding Tom. I trust he will not cancel Monday night, but as the lottery says (hey you never know.)
>
> Under any scenario, I am going to insist on the $500 K deposit be made a hard deposit and he can take up to 6 months to close.
>
> I am very concerned that his inaction with Audi is going to result in the package being kicked back to him for a potential restart. He is also risking burning bridges and ruining his good auspices with Audi by not communicating.
>
> I think that if he is looking for my assistance, and therefore looking to leverage me and Audi, perhaps my lawsuit and the $672,000 plus $57,000 that they took illegally (imho) from me can be a vehicle to broker an accommodation for Tom and Audi.
>
> Just a thought.
>
> I checked the last extension . . . it runs through May 7, not the 2nd as I had thought. If Tom is serious about continuing to honor the contract, he is going to have to communicate that to Audi ASAP.
>
> In the absence of these basic tenets, I don't see any useful purpose in getting together, but I am certainly not looking to close the door or blow up the deal, but I really have been overly accommodating to all his needs and issues, and I'm really really not of the mindset to "rework" this deal after ten months . . . .

("Apr. 20, 2016 Email from Rost to Broker" (ECF No. 110-30); *see* Rost Dep. Tr. at 277-78

(stating that in April 2016 he demanded that the deposit become nonrefundable).) The Broker

forwarded Rost's email to Maoli. (*Id.*) Maoli refused to have the "deposit to go hard." (Maoli Dep. Tr. at 279; Maoli Decl. ¶ 14.)

By letter dated April 27, 2016, Audi informed the Buyer and Seller that it was withholding its consent to the proposed sale of the Dealership, citing Maoli's failure to provide various requested and required documents and information necessary to demonstrate that the Buyer satisfies Audi's new dealer requirements. ("Audi Witholding Letter" (ECF No. 110-18.)

By letter dated May 3, 2016, Celebrity served written notice terminating the APA invoking Section 8.1(h). ("Termination Letter" (ECF Nos. 110-9, 117-6, 121-12).) Maoli avers that Celebrity terminated the APA because during the due diligence period, Celebrity learned, among other things, that the financial statements provided by Mohegan did not reflect Mohegan's true financial status. (Maoli Decl. ¶ 5.) For example, Mohegan's "adjusted" 2015 year-end financial statement, provided to Celebrity in March 2016 showed a decrease in Mohegan's 2015 "Net Profit" of $253,755 (or 30%), from the "Net Profit" of $849,549.00 recorded in Mohegan's January 2016 financial statement. (Maoli Decl. ¶¶ 6-7 (citing Exhibit C ("Net Profit" line 84 on page 2) and Exhibit D ("Net Profit" line 84 on page 2).) In addition, Mohegan's adjusted year-end 2015 financial statement also recorded as "Standard Bonus – Revenue" of $600,857.00 but Rost acknowledged that this nearly $600,000 is not "income" but money that Mohegan believed Audi owed to it and which was the subject of a lawsuit by Mohegan against Audi. (Maoli Decl. ¶¶ 3-4 (citing Exhibit C at page 2, line 66; Exhibit E at page 3).) Because of the foregoing, Maoli contends that Mohegan operated at a loss in 2015, not with a year-end "Net Profit" of $595,794, which was already 30% less than the profit previously disclosed in the January 2016 financial statement. (Maoli Decl. ¶ 11.)

F.      *Mohegan's Post-Termination Efforts*

Once the APA was terminated, Rost stopped working with a broker to sell the Dealership. (Rost Dep. Tr. at 70; *see* SUMF ¶ 26; RSUMF ¶ 26.) He also made no efforts to, nor has he offered, the Dealership for sale. (Rost Dep. Tr. at 70; *see* SUMF ¶ 27; RSUMF ¶ 27.) Rost avers that after the deal with Celebrity fell through, he determined that it would be best to conform the dealership to Audi requirements before trying to sell. (Rost Dep. Tr. at 75.) As of the time of his deposition in February 2019, Rost was working with Audi to modify Audi's demands for the Dealership. (Rost Dep. Tr. at 60.) In support of their summary judgment filings, Mohegan and the Rosts submitted a report prepared on April 7, 2019 by REDCOM Design and Construction for the renovation of the Dealership. (ECF No. 110-25.)

G.      *Damage Calculations*

In opposition to the motion for summary judgment, the Seller submitted an expert report by Mandeep Trivedi dated April 23, 2019 assessing damages on behalf of the Buyer to be approximately $4 million. ("Trivedi Report" (ECF No. 115-2); *see* CSUMF ¶ 5; RCSUMF ¶ 5.) This damage calculation is lost profits based on Maoli's subsequent inability to obtain financing to purchase a Toyota dealership. (Maoli Dep. Tr. at 82; *see* CSUMF ¶ 6; RCSUMF ¶ 6.) In or about June, 2016, Maoli started discussions to purchase a Toyota dealership. (Maoli Decl. ¶ 21.) Maoli signed a non-binding letter of understanding for the proposed Toyota dealership transaction in or around July 2017. (Trivedi Report at 5-6.) Maoli attests that he was unable to acquire financing for this dealership because Mohegan breached the APA and filed this litigation against Maoli personally. (Maoli Decl. ¶ 22.) Maoli testified that a bank told him it would not finance his acquisition of the Toyota dealership because of a "potential contingent liability from [this] lawsuit" and that Toyota told him it would not finance the deal because of "litigation." (Maoli Dep. Tr. at 23-24; *see* Maoli Decl. ¶¶ 21-22.)

The Seller also submitted a report from its own expert, William Murray, dated April 23, 2019, which calculates the fair market value of the assets contemplated by the APA as of May 31, 2016 as $5.4 million dollars. ("Murray Report" (ECF No. 110-24).) Murray was deposed on October 22, 2019 and testified that he was not asked to consider mitigation. ("Murray Dep. Tr." at 254 (ECF No. 121-12).)

   *H.    Relevant Provisions of the APA*

The introductory paragraph of the APA defines the "Effective Date" as "the date of the last signature to this Agreement" (APA at 1), which is November 10, 2015 (APA at 39). Section 3.5(a) provides in relevant part: "Within 3 business days of the Effective Date, the Purchaser shall deliver to the Escrow Agent the amount of Five Hundred Thousand and 00/100 Dollars ($500,000)." (APA at 12.)

Section 4.1 provides in relevant part: "Time, Date and Place of Closing. Subject to the provision of Article 8, the closing of the Transaction (the "Closing") shall take place at such time and location as the Parties shall mutually select on or before the 20th day following the satisfaction (or appropriate waiver in writing) of the conditions set forth in Section 4.2 below . . . , unless the Parties otherwise mutually agree (the "Closing Date")." (APA at 13.)

Section 4.2 provides in relevant part: "Conditions to Obligations of the Purchaser . . . (a) Accuracy of Representations. Each of the representations and warranties of the Seller and Shareholders contained in this Agreement shall be true and correct in all material respects, in each case on the date hereof and at as of the Closing Date . . . . (e) No Litigation. No Proceeding shall be pending, or threatened, or reasonably foreseeable, before any court or other Governmental Authority, wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (i) restrain, enjoin, prohibit or prevent consummation of the Transaction or any other transaction contemplated by this Agreement, (ii) cause the Transaction to be rescinded following

13

consummation, (iii) affect adversely the right of the Purchaser to own the Purchased Assets and to operate the former business of the Seller (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect) or (iv) except for the Proceeding with Manufacturer disclosed in Schedule 5.2(j), result in damages being imposed upon the Purchaser or its Affiliates." (APA at 14.)

Section 4.3 provides in relevant part: "Conditions to Obligations of the Seller . . . . (a) Accuracy of Representations. Each of the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects in each case on the date hereof and at as of the Closing Date as though made on and as of the Closing Date . . . (c) No Litigation. No Proceeding shall be pending, or threatened, or reasonably foreseeable, before any court or other Governmental Authority, wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (i) restrain, enjoin, prohibit or prevent consummation of any of the Transaction or any other transaction contemplated by this Agreement, or (ii) cause the Transaction to be rescinded following consummation . . . ." (APA 15.)

Section 5.1 provides "Representations and Warranties by the Purchaser. The Purchaser hereby represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows . . . . (a)(ii) The execution, delivery and performance of this Agreement and the Other Agreements to which it is a party by the Purchaser have been duly authorized by all requisite company action. Except the Consent of the Manufacturer to the appointment of the Purchaser as an authorized dealer in the Manufacturer's products, no approval or consent of any other person is required in connection with the execution, delivery, and performance by the Purchaser of this Agreement and the Other Agreements to which it is a party." (APA 19.)

Section 8.1 provides in relevant part: "Termination and Abandonment: This agreement may be terminated at any time prior to the closing: (a) by the Purchaser by Notice to the Seller, if the conditions set forth in Section 4.2 have not been satisfied of the deliveries required by Section 4.4 shall not have been complied with . . . (b) by the Purchaser by Notice to the Seller, if there has been a material breach by the Seller and/or the Shareholders of any representation, warranty covenant or agreement set forth in this Agreement . . . (c) by the Seller by Notice to the Purchaser, if the conditions set forth in Section 4.3 have not been satisfied or the deliveries required by Section 4.5 have not been complied with . . . (d) by the Seller by Notice to the Purchaser, if there has been a material breach by the Purchaser of any representation, warranty covenant or agreement set forth in this Agreement . . . (e) by mutual agreement of the Seller and Purchaser . . . (h) by the Purchaser, on or before the expiration of the Due Diligence Period, if the Purchaser is dissatisfied with its due diligence inspections . . . ." (APA 34-35.)

Section 8.2(a) provides "If this Agreement is terminated as provided in Section 8.1, this Agreement shall forthwith become void, there shall be no liability or obligation on the part of any Party or their respective officers, directors, partners. members. The Shareholders, principals, agents or representatives, and the Escrow Agent shall return the Deposit to the Purchaser." (APA 35.) Section 8.2(b)(i) provides that if the Agreement is terminated and abandoned pursuant to Sections 8.1(c) or (d) due to breach or default by the Purchaser the seller shall be entitled to the Deposit, which shall be the "Seller's sole and exclusive remedy." (APA at 35.) Section 8.2(b)(ii) provides, inter alia, that if the Agreement is terminated or abandoned pursuant to Sections 8.1(a) or (b) due to a breach by the Seller, then the escrow agent shall return the Deposit to the Purchaser. (APA at 35.)

The APA contains a choice of law provision selecting New York. (APA at 36.)

## II.    Procedural History

Mohegan filed this action on August 25, 2016 alleging breaches of contract and of the covenant of good faith and fair dealing against Maoli by way of alter-ego liability and against Celebrity directly, and alleging fraud against Maoli. (ECF No. 1.)

Celebrity and Maoli moved to dismiss. (ECF No. 24.) The Court granted the motion in part, dismissing Mohegan's claim for breach of the covenant of good faith and fair dealing, and denying the motion as to the remaining claims. (ECF No. 35.) Specifically, the Court held that Mohegan had alleged (1) sufficient facts to state a claim for alter-ego liability where Celebrity's ability to perform under the APA was dependent upon Maoli's finances and ability to do so, (2) that Maoli had a duty to disclose that the divorce court had enjoined him from acquiring or selling any businesses or real or personal property during the pendency of the divorce action unless agreed to by the parties with court approval, and (3) under the superior knowledge doctrine, it was appropriate to proceed with side by side claims of fraud and breach of contract. (*Id*.)

Celebrity and Maoli filed an amended answer to Mohegan's complaint, and asserted a counterclaim against Mohegan and a third-party claim against the Rosts for breach of contract and contractual indemnification. ("Counterclaim" ECF No. 78.) Celebrity and Maoli allege that the Seller breached the APA by misrepresenting Mohegan's 2015 Net Profits in its financial statements, and, further, that this lawsuit, which names both Celebrity and Maoli violates Section §8.2(a) of the APA. Mohegan and the Rosts answered the counterclaim and third-party complaint. (ECF No. 80.)

Celebrity and Maoli have moved for summary judgment in their favor, averring that (1) there is no evidence from which a reasonable jury could conclude that (A) Celebrity is Maoli's

alter ego or (B) that Maoli used Celebrity to commit a fraud or other injustice; and further that (2) Mohegan's breach of contract claims are barred by its failure to mitigate. (ECF No. 105.)

Mohegan opposed Celebrity and Maoli's motion filed a cross-motion for summary judgment, averring that (1) Maoli used Celebrity to fraudulently induce the Seller into the APA and then to secure repeated extensions of the Due Diligence period on false pretenses, and (2) the Court must dismiss Celebrity and Maoli's breach of contract claim because they have failed to prove any injury where Maoli testified only that he was denied financing for the acquisition of another dealership because of the contingent liability created by the existence of this lawsuit. (ECF No. 112.)

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). At the summary judgment stage "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

## DISCUSSION

## I.    Mohegan's Alter Ego Liability Claims Against Maoli

A threshold issue is whether Maoli can personally be held liable for breach of contract or fraud when he was acting on behalf of Celebrity during the transaction.[4] The Court concludes that a dispute of material fact precludes summary judgment on this issue.

---

[4] "New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020). Additionally, "[i]n the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004). No conflict exists between the laws of New Jersey and New York for piercing the corporate form. *See Transmodal Corp. v. EMH Assocs., Inc.*, No. CIV. 09-3057 (FSH), 2010 WL 3937042, at *5 (D.N.J. Oct. 1, 2010) (holding that there is no conflict between the veil-piercing laws of New York and New Jersey); *Pactiv Corp. v. Perk-Up, Inc.*, No. CIV. A. 08-05072 DMC, 2009 WL 2568105, at *6 (D.N.J. Aug. 18, 2009) (deciding on motion to dismiss that "[b]ecause the legal analysis required to determine whether piercing the veil is appropriate under New Jersey law is substantially similar

A.     *Piercing the Corporate Veil*

"The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners." *Morris v. N.Y. Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 140 (N.Y. 1993). "[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Id.* at 1160-61 (1993); *see Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC*, 402 F. App'x 623, 625 (2d Cir. 2010) ("A party urging piercing of a corporate veil must generally prove that '(1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff.'" (quoting *Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1052 (2d Cir. 1997)).

New York courts consider ten overlapping factors to decide whether the requisite degree of domination is present:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether

---

to that required by New York law, the Court need not address the choice of law question at this time"). Additionally, the parties concede that New York and New Jersey have similar laws in this area (Buyer's Mem. In Support at 7-8 (ECF No. 106); Seller Opp'n Mem. at 13 n.1 (ECF No. 109)). Accordingly, the Court applies New York law. The analysis would be the same if New Jersey law were applied.

the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

"A plaintiff need not demonstrate that all of the *Passalacqua* factors apply to support a finding that defendant dominated the corporation. '[T]here is no set rule as to how many . . . factors must be present in order to pierce the corporate veil.'" *iPayment, Inc. v. 1st Americard, Inc.*, No. 15-CV-1904 (JMF), 2017 WL 727538, at *3 (S.D.N.Y. Feb. 23, 2017) (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d. Cir. 1989)).

The Second Circuit has observed that it is particularly difficult to determine whether veil piercing is warranted in the case of:

small privately held corporations where the trappings of sophisticated corporate life are rarely present. In such instances, preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history would inevitably beckon the end of limited liability for small business owners, many, if not most, of whom have chosen the corporate form to shield themselves from unlimited liability and potential financial ruin.

*Wm. Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989). Nonetheless, "veil piercing is warranted when 'an abuse of that form either through on-going fraudulent activities of a principal, or a pronounced and intimate commingling of identities of the corporation and its principal or principals.'" *Atateks Foreign Trade, Ltd.*, 402 F. App'x at 626 (quoting *Wm. Wrigley Jr. Co.*, 890 F.2d at 601). "[A]lthough there is no mechanical rule as to how many and to what degree the factors outlined in *Wrigley* must be present to pierce the corporate veil, the courts apply the preexisting and overarching principle that liability is imposed to reach an equitable result." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996).

With respect to whether "control has been used to commit a fraud or other wrong," *Freeman,* 119 F.3d at 1052, injustice beyond fraud suffices, *see, e.g.*, *Elec. Switching Indus., Inc. v. Faradyne Elecs. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987) (explaining that to pierce the corporate veil, a party must allege "wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights").

As long as there is evidence from which a reasonable jury could conclude that piercing the corporate veil is warranted, "[t]he jury must decide whether—considering the totality of the evidence—the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation." *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139 (citation omitted); *see Peterson for Lancelot Invs. Fund, L.P. v. Imhof,* No. 13-CV-0537, 2017 WL 1837856, at *12 (D.N.J. May 8, 2017) ("The issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form."); *see also Abu-Nassar v. Elders Futures Inc.*, No. 88 CIV. 7906 (PKL), 1991 WL 45062, at *12 (S.D.N.Y. Mar. 28, 1991) (denying motion for summary judgment on alter ego liability claim where opposing party adduced evidence that sole shareholders and principal officers intermingled personal and corporate funds and siphoned corporate funds for their personal use, it was unclear whether the corporation maintained proper records, the corporation had never held an official annual meeting, and was undercapitalized).

   *B.*  *Application*

Maoli and Celebrity aver that no reasonable factfinder could conclude that Celebrity had "no separate existence" and that, even if Maoli dominated Celebrity, no reasonable factfinder could conclude that Maoli used Celebrity to perpetrate a fraud. Mohegan avers that Maoli used Celebrity—which had no assets, no business, no employees, and no way to satisfy a judgment—

to wrong Mohegan and therefore that Maoli is liable. As explained below, the Seller has adduced evidence from which a reasonable jury could conclude that Maoli used Celebrity to perpetrate injustice against the Seller.

*Maoli's Domination of Celebrity*: The parties do not dispute that Celebrity is a separately formed LLC with its own operating agreement and employer identification number. It is also undisputed that Celebrity created a bank account in December 2015, after the APA was signed and deadline for the Buyer to put the $500,000 deposit in escrow had passed. Maoli admits that it appears that the escrow check (ostensibly securing Celebrity's option to consummate the transaction) was drawn from his personal account—which suggests a commingling of funds—and he never funded Celebrity—going to the undercapitalization of Celebrity. Additionally, Celebrity had no employees of its own and shared a mailing address. phone number, and staff with Maoli's other corporations, particularly Route 10 Lexus. Additionally, Maoli and his staff used email addresses associated with Lexus of Route 10 for the written communications related to the transaction. These facts could lead a reasonable jury to conclude that Maoli dominated celebrity. *See, e.g.*, *Wm.Passalacqua Builders, Inc.*, 933 F.2d at 139-140 (noting that overlap in staff, officers, and directors, and that employees of one corporation were sometimes paid as though they actually-worked for another corporation were factors indicating that piercing the corporate veil would be appropriate); *Lakah v. UBS AG,* 996 F.Supp.2d 250, 263 (S.D.N.Y. 2014) (holding that defendant's transfer of personal funds to the defendant corporation was evidence of domination and control).

*Abuse of Corporate Form to Perpetrate Fraud*: As to the alleged wrongdoing, the Seller's alter ego liability claims are predicated on three alleged misrepresentations or omissions made by Maoli who was acting on behalf of Celebrity, upon which the Seller relied to its detriment.

The Buyer mistakenly contends that Seller's alter ego claim fails because the alleged fraud or injustice is related to the underlying fraud and breach of contract claims. (Buyer's Mem in Support at 11 (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008)). This misstates what is required. The language in *Netjets* upon which the Buyer relies is from *Mobil Oil Corp. v. Linear Films, Inc.*, which held in a matter in which a subsidiary allegedly infringed the plaintiff's patents that

> Any breach of contract and any tort—such as patent infringement—is, in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice.

718 F. Supp. 260, 268 (D. Del. 1989). A plaintiff must allege "more" than the underlying fraud or breach of contract in the sense that in addition to the fraud or breach of contract or other injustice he or she must also allege that "the *corporate structure itself* [was] used to further the fraud or injustice or 'as a shield for' unjust acts." *Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.,* No. 18 CIV. 5831 (PAE), 2020 WL 6690659, at *11 (S.D.N.Y. Nov. 13, 2020) (quoting *Netjets*, 537 F3d at 177) (emphasis added). Neither *Netjets* nor *Mobil Oil Corp.* stand for the broad proposition that in order to pierce the corporate veil, a party must allege a fraud or injustice wholly separate from the underlying contract or tort cause of action. Courts routinely pierce the corporate veil where there is a nexus between the domination and the injustice, even if the injustice forms a basis for the underlying cause of action, so long as the corporate form is used to perpetrate the injustice. *See, e.g., Travelers Prop. Cas. Co. of Am. v. Quickstuff, LLC.*, No. CV 14-6105 (RBK/JS), 2016 WL 7231605, at *9 (D.N.J. Dec. 14, 2016) (holding where defendant did not contest that various entities "were mere instrumentalities for his business operation" that "the Court has already found that Plaintiff is entitled to summary judgment against Diaz regarding his fraudulent transfer of

assets from Quickstuff to A&C [because] [t]his fraudulent transfer is certainly an instance of Diaz abusing the corporate form to perpetrate a fraud against Plaintiff).

The Court addresses the fraudulent inducement claim below, but notes that a reasonable jury could conclude that Maoli abused Celebrity's corporate form to obscure the fact that neither he nor Celebrity could consummate the transaction during the pendency of the divorce without approval from the divorce court while he continued to pursue an option to acquire . *See, e.g.*, *Aacon Contracting, LLC v. Poppe*, No. A-1500-11T2, 2012 WL 3064238, at *4 (N.J. Super. Ct. App. Div. July 30, 2012) (affirming piercing of corporate veil and summary judgment award against sole owner, shareholder, and officer of various corporate entities who used corporate form to make false representation that induced plaintiff into contract).

Separately, Plaintiff may sustain an alter ego liability claim based upon certain alleged misrepresentations by the Buyer during the due diligence period. First, Maoli avers that he sent a copy of the $500,000 escrow check on behalf of Celebrity to Mohegan. There is no dispute that Maoli made this representation to Rost and that the Buyer referenced the deposit in its letters requesting extensions of the due diligence period. A member of Maoli's staff told another member that the check was not sent and the escrow agent claims never to have received the check. Maoli further admits that this check appears to have been drawn from his personal account, which is likely since a separate bank account was not created for Celebrity until nearly a month after the check was purportedly sent to the escrow agent. While it is unclear from the evidence before the Court whether Maoli's misrepresentation regarding the Escrow Check was intentional, the misrepresentation may nonetheless contribute to a finding that Maoli abused the corporate form of Celebrity to perpetrate injustice.

In contrast, the Seller's argument that extensions of the due diligence period were obtained based upon misstatements is insufficient to contribute to a finding that Maoli abused the corporate form of Celebrity. Plaintiff avers that the Buyer sought extensions of the due diligence period on false pretenses and that, if he had known about the injunction, he would never have extended the due diligence period. None of the Buyer's letters requesting extensions state the reasons for the extension. Instead, when Rost reported to his attorney in January 2016 that the Buyer sought the first extension because Audi was still reviewing the financial package. When the Buyer sought an additional extension in March 2016, Seller's counsel asked why the extension was necessary, Maoli responded that they did not have Audi approval yet and "[w]e do not have our arms around [t]he building issues." Audi did not conclude its review and withhold its consent to the proposed transfer of the dealership until April 27, 2016. To the extent this is a variation on the Seller's fraudulent inducement claim (i.e., that the Buyer failed to correct the misrepresentation that at the time the parties entered into the APA no third-party consent was required for the Buyer to consummate the transaction), that issue is discussed below. Otherwise, the Seller has failed to demonstrate that the Buyer's disclosure of some but not all of the reasons for extensions is a material misstatement that in and of itself amounts to an injustice.

In sum, the Court must deny the Buyer's motion for summary judgment on the alter ego liability claim because the Seller has adduced evidence upon which a reasonable jury could find that it is appropriate to pierce the corporate veil and hold Maoli personally liable.

## II.    Fraudulent Inducement

Mohegan alleges that Maoli fraudulently induced the Seller to enter into the APA by mispresenting that no third-party approval was required to consummate the deal.[5] The Buyer avers

---

[5] Because there is no conflict between New York and New Jersey law regarding fraudulent inducement or common law fraud, *Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.*, No.

that there is no evidence upon which a reasonable jury could conclude that Maoli or Celebrity defrauded the seller. Whether this claim can be asserted against Maoli individually depends on the alter ego liability discussed above, and issue which the Court cannot resolve at the summary judgment stage. Assuming that the corporate veil can be pierced to hold Maoli individually liable, the Court considers whether the fraudulent inducement claim survives summary judgment. As explained below, if the jury concludes that alter ego liability is appropriate, then the Seller has adduced sufficient evidence from which a reasonable jury could conclude that Maoli fraudulently induced the Seller to enter into the APA.

> A.    *Fraudulent Inducement Claims*

The elements of a claim for common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages. *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 578-79 (N.Y. 2018). Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong. *Stewart v. Jackson & Nash,* 976 F.2d 86, 89 (2d Cir. 1992) ("While [m]ere promissory statements as to what will be done in the future are not actionable, . . . it is settled that, *if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact* upon which an action for recision [based on fraudulent inducement] may be predicated." (quoting *Sabo v. Delman*, 164 N.Y.S.2d 714, 716 (N.Y. 1957))).

---

16 CIV. 5561 (PAE), 2020 WL 614991, at \*4 (S.D.N.Y. Feb. 10, 2020), and the choice of law provision of the APA selects New York, the Court applies New York law. The result would be the same if New Jersey law were applied.

A party can prevail on a claim of fraud between parties with a contractual relationship where it (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996). In other words, "a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 184 (2d Cir. 2007) (quoting *First Bank of the Americas v. Motor Car Funding, Inc.,* 690 N.Y.S.2d 17, 21 (1st Dep't 1999)).

B.    Application

The Buyer avers that it could not have fraudulently induced the Seller into the LOI or APA because the pendency of Maoli's divorce was disclosed and, moreover, any misrepresentation regarding the divorce was an omission, which can only form the basis of a fraud claim if there was a duty to disclose. The Court disagrees with the Buyer for two reasons: (1) the express warranty in the APA constitutes an affirmative misrepresentation of fact; and (2) under the superior knowledge doctrine, the Buyer had a duty to disclose the injunction.

As to the first issue, the Seller does not *merely* claim that Maoli fraudulently induced it into the APA by omitting that the injunction barred consummation of the transaction without approval of the divorce court. Rather, the Seller points to the Buyer's express warranty in Section 5.1(a)(ii) of the APA that "as of the date hereof and as of the Closing Date . . . . [e]xcept the Consent of the Manufacturer to the appointment of the Purchaser as an authorized dealer in the Manufacturer's products, no approval or consent of any other person is required in connection with the execution, delivery, and performance by the Purchaser of this Agreement and the Other Agreements to which it is a party." (APA 19). In other words, the Seller contends that by signing

27

the APA, Maoli on behalf of Celebrity affirmatively misrepresented that as of the effective date no third-party consent—such as that of the divorce court—was required for the Buyer to consummate the transaction. The existence of the injunction barring Maoli from entering into any transactions during the pendency of the divorce proceeding without approval from the divorce court makes the warranty that no third-party consent was required " not a promise of performance, but a [mis]statement of present fact. Accordingly, a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim." *First Bank*, *690* N.Y.S.2d at 21.

Maoli contends that despite the language of the APA, he verbally disclosed both his divorce and the injunction, which is why certain provisions and warranties appear in the APA. However, the express warranty in Section 5.1(a)(ii) is patently inconsistent with the existence of the injunction at the time the APA was executed and the Buyer cannot rely on any extrinsic statements to contradict this plain language. "A contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable business people—to pause." *Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F. Supp. 920, 924 (D. Mass. 1993) (fraud claim rejected where precise terms of contract prevented reasonable reliance on prior oral statements); *see also Pierce v. Atchison, Topeka & Santa Fe Ry. Co.,* 65 F.3d 562, 569-70 (7th Cir. 1995) (holding that reliance on oral statements inconsistent with written contract is unreasonable as matter of law). Although introduction of extrinsic evidence to prove fraud in the inducement is a well-recognized exception to the parol evidence rule, a party may not seek to contradict the express terms of a writing to avoid obligations he knowingly assumes. *See, e.g.*, *Davidowitz v. Patridge,* No. 08 Civ. 6962, 2010 WL 5186803, *10 (S.D.N.Y. Dec. 7, 2010) (holding that "sophisticated business persons are bound by a contract that they sign despite their

failure to read it"); *Guerra v. Astoria Generating Co., L.P.* 779 N.Y.S.2d 563, 564 (2d Dep't 2004) ("A party that signs a document is conclusively bound by its terms absent a valid excuse for having failed to read it.") Even if the Court could consider the parol evidence, Maoli's self-interested testimony that he told the Seller that he would need divorce court approval unless the transaction closed after his divorce was finalized is contradicted by that of Rost, the Broker, and the Audi Area General Manager, all of whom acknowledged that they were aware that Maoli was in the midst of a divorce but insisted that they were never told that Maoli was enjoined from consummating the transaction.

As to the second issue—Maoli's duty to disclose—the Court previously held that Mohegan's complaint plausibly alleged that the Seller had a duty to disclose under the superior knowledge doctrine. (ECF No. 35 at 11-13.) The Buyer maintains that the injunction was publicly available and avers that the Seller was effectively put on notice that Celebrity could not consummate the transaction at the time the APA was signed because Maoli postdated the APA to a date after which he believed his divorce would be concluded and, at an earlier stage of the negotiation, indicated that he could not provide a guaranty or show personal liability because of his pending divorce. None of the aforementioned statements amount to a disclosure of the injunction.

Moreover, in opposition to the Buyer's motion, the Seller has adduced evidence from which a reasonable jury could conclude that Maoli had superior knowledge and it was reasonable for the Seller to rely on the Buyer's explicit warranties in the APA and forego its own inquiry into any legal constraint on Maoli's personal ability to enter into transactions—including transactions through purportedly independent LLCs—during the pendency of his divorce. Maoli held Celebrity out as a separate entity and explicitly warranted that no third-party consent was required to

consummate the deal. "Where . . . a plaintiff has taken reasonable steps to protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred. In particular, where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry." *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (N.Y. 2010).

The Buyer's reliance on the doctrine of inquiry notice is misplaced. That doctrine generally relates to whether a fraud claim has been brought within the statute of limitations. *See, e.g.*, *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (1st Dep't 2011) ("The test as to when fraud should with reasonable diligence have been discovered is an objective one. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." (citations and quotation marks omitted)); *see also Catena v. Raytheon Co.*, 447 N.J. Super. 43, 57 n.1 (N.J. Super. Ct. App. Div. 2016) ("New York law also recognizes a form of 'inquiry notice,' which triggers the limitations period if the plaintiff knows facts which would lead a reasonable person to inquire into possible fraud, but fails to pursue an investigation."). Even if the Buyer has adduced evidence from which a reasonable jury could conclude that the Seller should have conducted some additional inquiry into whether Maoli's statements about constraints on the transaction due to his divorce—including timing of the transaction and Maoli's ability to provide a personal guaranty—were matters of preference or diversion of his attention or, as was actually the case, legal barrier to consummating the transaction, there is no question that the Seller discovered the alleged fraud and brought his claim within the limitations period. In other words,

the doctrine of inquiry notice cannot overcome either the explicit warranty in the APA or the superior knowledge doctrine.

In sum, the Court DENIES the Buyer's motion for summary judgment on fraudulent inducement because the Seller has adduced evidence upon which a reasonable jury could conclude that the Buyer fraudulently induced the Seller to sign the APA.[6]

## III.   Breach of Contract Claims

Mohegan asserts a breach of contract claim against Celebrity and against Maoli individually. The Buyer avers that Mohegan's claim is barred by its failure to mitigate damages. The Buyer also asserts a breach of contract and indemnification Counterclaim and Third-Party claim against the Seller. The Seller avers that the Buyer's breach of contract claim must be dismissed because the Buyer failed to adduce any evidence of damages caused by the Seller's alleged breach. The Court addresses the parties' respective claims and defenses in turn.

### A.    Breach of Contract Claims

To prevail on a breach of contract claim, a party must prove the following elements: (1) a valid contract existed between the parties; (2) the adversary breached the contract; (3) the party performed its obligations under the contract; and (4) the party was damaged as a result of the breach.[7] *Clear Choice Enters., Inc. v. Cellebrite USA, Inc.*, No. 14-CV-3372 ADS SIL, 2015 WL 1469298, at *6 (E.D.N.Y. Mar. 28, 2015).

---

[6] To the extent that the Seller contends that Maoli made material misrepresentations during the Due Diligence period related to the escrow check or the reasons for extending the due diligence period, misrepresentation in the performance of the contract cannot be the basis of a fraud claim. *See Rosenblatt v. Christie, Manson & Woods Ltd.*, 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005) ("[A]lleged concealment of a breach is insufficient to transform what would normally be a breach of contract action into one for fraud.")

[7] Because "there is no conflict regarding the elements of a breach contract claim in New York and New Jersey," *Clear Choice Enters., Inc. v. Cellebrite USA, Inc.*, No. 14-CV-3372 ADS SIL, 2015 WL 1469298, at *6 (E.D.N.Y. Mar. 28, 2015) (internal quotation marks and alterations

Damages can be general or consequential/special. General damages "are the natural and probable consequence of the breach" of a contract and include "money that the breaching party agreed to pay under the contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 805 (N.Y. 2014) (citations omitted). "By contrast, consequential, or special, damages do not directly flow from the breach." *Id.* "Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are 'the direct and immediate fruits of the contract." *Id.* Where the damages reflect a "loss of profits on collateral business arrangements," they are only recoverable when "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Id.*

Failure to mitigate damages is an affirmative defense to a breach of contract claim, which "requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages." *Robin Bay Assocs., LLC v. Merrill Lynch & Co.,* No. 07 CIV. 376 (JMB), 2008 WL 2275902, at *8 (S.D.N.Y. June 3, 2008). "Whether a party puts forth sufficient effort to mitigate damages is a question of fact and typically resolved during trial." *Id.*

B.    *Seller's Breach of Contract Claim Against Buyer*

Mohegan contends that rather than properly terminating the APA, Celebrity breached it and seeks to hold both Celebrity and Maoli liable. The Buyer moves for summary judgment in its favor on Mohegan's breach of contract claim because Mohegan failed to mitigate damages after the termination of the APA. Mohegan counters that it was only required to make *reasonable* efforts

---

omitted), and the choice of law provision in the APA selects New York, the Court applies New York law. The result would be the same if the Court applied New Jersey law.

to mitigate and that Maoli and Celebrity have failed to adduce any facts that that Mohegan *unreasonably* failed to mitigate. The Court agrees with Mohegan that whether Mohegan's actions following the termination of the APA were reasonable is a question of fact reserved for the jury.

The parties do not dispute that after the APA was terminated, the Seller stopped working with a broker or otherwise making efforts to sell the Dealership. Rost testified that following termination, he determined that it would be best to conform the dealership to Audi requirements before trying to sell. (Rost Dep. Tr. at 75.) As of the time of his deposition in February 2019, Rost was working with Audi to modify Audi's demands for the Dealership. (Rost Dep. Tr. at 60.) Towards that end, and in support of their summary judgment filings, Mohegan and the Rosts submitted a report prepared on April 7, 2019 by REDCOM Design and Construction for the renovation of the Dealership. (ECF No. 110-25.) Based on the above, the Court finds that there is sufficient evidence upon which a reasonable jury could conclude that the Seller made reasonable efforts to mitigate. Accordingly, the Buyer's motion for summary judgment in its favor of the Seller's breach of contract claim is DENIED.

### C.    *Buyer's Breach of Contract Counterclaim and Third-Party Claim Against Seller*

The Seller cross-moves for summary judgment on the Buyer's claim against the Seller for breach of contract. The Buyer avers that a question of material fact as to whether Toyota and Sterling's denial of financing to Maoli for a different dealership constitutes cognizable damages caused by the Seller's alleged breach of the APA.[8]

---

[8] The Buyer also claims for the first time in opposition to the Seller's cross-motion for summary judgment that the Seller's filing of this action against Maoli personally violates Section 8.2(a) of the APA. The Counterclaim and Third-Party Complaint alleges that the Seller "breached the terms of the APA by, among other things, breaching §4.2, and §5.2 and §7.1 of the APA." (Counterclaim ¶ 33.) The Counterclaim and Third-Party Complaint does not invoke Section 8.2 at all. A party may not amend its allegations through subsequent briefing. *See, e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (finding no basis for plaintiff's contention that

The Counterclaim and Third-Party Complaint alleges that because of the Seller's misrepresentations regarding the financial status of the dealership, the Buyer (1) expended additional resources after entering into the APA to ensure the sale would go through, (2) was unable to enter into new financing and/or refinancing agreements, and (3) its goodwill has been damaged such that it cannot "successfully conclude any new transactions to purchase automobile dealerships. However, the only evidence the Buyer presented on summary judgment regarding alleged damages is Maoli's own testimony that he was unable to obtain financing to acquire a Toyota dealership. The Buyer's expert opines that as a result of the inability to acquire that Toyota dealership, Maoli lost approximately $4 million in profits. Consequential damages in the form of lost profits on collateral business arrangements are only recoverable where a party demonstrates (1) that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) the damages were fairly within the contemplation of the parties. *E.g.*, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (distinguishing between general damages resulting from benefit of the bargain and speculative profits on collateral transactions). The Buyer has failed to adduce evidence of at least the first and third of these conjunctive prongs.

As to the first prong, Maoli has merely stated his own belief, unsupported by admissible evidence, that third parties denied him financing for the Toyota dealership because of his ongoing dispute with the Seller. (Maoli Dep. Tr. at 8-9.) Maoli's recollection of statements made by third parties regarding their reasons for denying him financing for the Toyota dealership constitute inadmissible hearsay. Maoli's own statements, unsupported by any admissible evidence

---

complaint stated a misrepresentation claim where plaintiff "mentioned it for the first time in her opposition memoranda to the motion to dismiss").

confirming that financing was denied because of the Seller's breach or this litigation, is insufficient to create a dispute of material fact. *See, e.g.*, *Marvel Worldwide, Inc. v. Kirby,* 777 F.Supp.2d 720, 730 (S.D.N.Y.2011) ("In opposing a motion for summary judgment, the non-movant may not rely on inadmissible evidence, such as hearsay, to create a disputed issue of fact.").

Moreover, as to the third prong, Maoli has adduced no evidence from which a reasonable jury could conclude that any lost profits from Maoli's efforts to acquire a different car dealership after the termination of the APA were reasonably contemplated by the parties at the time they entered into the APA. *See, e.g.*, *Travelers Ins. Co. v. Providence Washington Ins. Grp.*, 530 N.Y.S.2d 390, 391 (4th Dep't 1988), *amended on other grounds sub nom. Travelers Ins. Co., as Assignee of Betty J. Millis, Also Known as Betty J. Hanehan, Respondent, v. Providence Washington Ins. Grp.*, *Appellant.*, 149 A.D.2d 985 (4th Dep't 1989) (holding in action to recover under mortgagee clause of standard fire insurance policy that "expenses of a foreclosure action and payment of tax liens incurred *after* the fire cannot be deemed to have been within the contemplation of the parties to the insurance contract").

Accordingly, the Court must grant the Seller's cross-motion for summary judgment as to the Buyer's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Buyer's motion for summary judgment is DENIED as to Mohegan's alter ego liability, fraudulent inducement, and breach of contract claims. The Seller's cross-motion for summary judgment is GRANTED as to the Buyer's breach of contract claim against the Seller and that claim is dismissed. The parties are directed to appear for a telephonic pre-trial conference on October 13, 2021 at 2:00 PM. To access the telephonic pre-trial conference,

please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access

Code: 1231334#; (3) press pound (#) to enter the conference as a guest.

    The Clerk of the Court is directed to terminate the motions at ECF Nos. 105 and 112.

Dated:    September 10, 2021             SO ORDERED:
           White Plains, New York

                                      _____
                                     NELSON S. ROMÁN
                               United States District Judge