UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/27/2023
```

MOHEGAN LAKE MOTIORS, INC.,

       Plaintiff/Third-Party Defendant,

-against-

THOMAS MAOLI, and CELEBRITY AUTO OF MOHEGAN LAK, LLC,

       Defendants/Third-Party Plaintiffs,

-against-

BARRY ROST and WILLIAM ROST,

       Third-Party Defendants.

No. 16-CV-6717 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    Plaintiff Mohegan Lake Motors, Inc. ("Plaintiff") filed this action on August 25, 2016, alleging breaches of contract and of the covenant of good faith and fair dealing against Defendant Thomas Maoli ("Defendant" or "Maoli") by way of alter-ego liability and against Celebrity Auto of Mohegan Lake, LLC ("Defendant" or "Celebrity") directly, and alleging fraud against Maoli. (ECF No. 1.) A trial is scheduled for February 8, 2023. (Minute Entry, dated June 29, 2022.)

    Before the Court is Plaintiff's motion *in limine* seeking to clarify that Defendants' counterclaim on summary judgment for contractual indemnification has been dismissed and is not to be tried. (ECF No. 165.) Defendants counter that the Court's Opinion and Order dated September 9, 2021 (the "Opinion") dismissed only Defendants' breach of contract claim and did not rule upon Defendants' contractual indemnification claim. (ECF no. 168, at 2.)

    For the following reasons, Plaintiff's motion is GRANTED, to the extent the Court construes it to be a motion under Federal Rule of Civil Procedure 60(a) ("Rule 60(a)") to clarify

that the Court intended to dismiss Defendants' contractual indemnification claim in its Opinion. (ECF No. 122.). Pursuant to Rule 60(a), the Court confirms that Defendants have no affirmative claims to be tried and thus Defendants' claim for contractual indemnification as against Plaintiff is deemed dismissed.

**BACKGROUND**

### I. Factual Background

The facts in this section are drawn from the Buyer's Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("SUMF" (ECF No. 107)), the Seller's Response to the SUMF ("RSUMF" (ECF No. 108)), the Seller's Statement of Undisputed Facts in Support of its Cross-Motion for Summary Judgment ("CSUMF" (ECF No. 114)), the Buyer's Response to the CSUMF ("CRSUMF" (ECF No. 119)), the Declaration of Marc Gross in Support of the Buyer's Motion for Summary Judgment ("Gross Supporting Decl." (ECF No. 121)), the Declaration of Jarod Taylor in Opposition to the Motion for Summary Judgment ("Taylor Opp'n Decl." (ECF No. 110)), the Declaration of Barry Rost in Opposition to the Motion for Summary Judgment ("Rost Decl." (ECF No. 111)), the Declaration of Thomas Maoli in Opposition to the Seller's Cross-Motion for Summary Judgment ("Maoli Decl." (ECF No. 117)), Jarod Taylor's Declaration in Support of the Seller's Cross-Motion for Summary Judgment ("Taylor Supp. Decl." (ECF No. 115)), and corresponding exhibits. Facts are undisputed except where indicated.

The Court assumes the parties' familiarity with the facts of this case and reiterates only those facts applicable to the instant motion.

### A. *Undisputed Facts Regarding the Transaction*

Defendant Barry Rost owns the Mohegan Audi dealership ("the Dealership") and some of the real estate upon which the Dealership operates with his brother, William Rost.

Maoli owns and operates a number of car dealerships under various entities including Celebrity Motorcar ("Maoli Dep. Tr." at 106 (ECF Nos. 110-1, 115-3)), Lexus of Route 10, Maserati of Morris County, BMW of Springfield NJ, and NMK SAAB (*see* ECF No. 110-28 email signature block for Maoli indicating that he is "Dealer Principal" of the aforementioned entities).

In or about 2014, Rost decided to sell the Dealership, engaged a broker—Tony Assalone ("the Broker")—to market the Dealership and find a suitable buyer, and authorized Audi to find buyers. ("Rost Dep. Tr." at 59, 72, 74, 78 (ECF Nos. 110-2, 121-1); *see* SUMF ¶ 1; RSUMF ¶ 1.) At the time, Rost had health issues and did not have the funds to improve the Dealership to meet Audi's requirements. (Rost Dep. Tr. at 59-60.)

The Broker brought the deal to Maoli, with whom he had a prior professional relationship. ("Assalone Dep. Tr." at 94-96 (ECF Nos. 110-3 and 121-14); *see also* Rost Dep. Tr. at 82-83, 89). Around June 2015, Rost and Maoli began discussing the potential sale of the Dealership. On June 16, 2015, in connection with the potential transaction, Maoli formed Celebrity of Mohegan Lake ("Celebrity"), a New Jersey limited liability corporation ("LLC"), of which he was the sole member. ("Formation Cert." (ECF No. 110-20, 121-2); *see* SUMF ¶ 2; RSUMF ¶ 2.) Celebrity was assigned an employer identification number by the Internal Revenue Service ("IRS Letter" (ECF No. 121-3), but Celebrity never had any employees (Maoli Dep. Tr. at 109). Celebrity has an undated operating agreement signed by Maoli indicating that Celebrity is an LLC, that Maoli is the sole member with a 100% ownership interest. (ECF No. 110-21.)

On June 19, 2015, Celebrity and Mohegan executed a non-binding letter of intent ("LOI"). ("LOI" (ECF Nos. 110-11, 121-5); *see* SUMF ¶ 4; RSUMF ¶ 4.)

As early as July 2015, Maoli was in conversations with Audi regarding the financing of upgrades that would be required at the Dealership. (Maoli Dep. Tr. at 134-35; "July 9, 2015 email from Maoli to Rick Fuller" (ECF No. 110-27).)

On August 19, 2015, an Order was entered in Maoli's divorce proceeding enjoining him from acquiring or selling any further business, or real or personal property during the pendency of the divorce action unless agreed to by the parties with court approval (the "Injunction"). ("Injunction" (ECF Nos. 110-17, 121-8); *see* SUMF ¶ 11; RSUMF ¶ 11.)

On or about October 16, 2015, Mohegan and Celebrity entered into a written asset purchase agreement ("APA"), pursuant to which Celebrity agreed to purchase certain enumerated assets of the Dealership. ("APA" (ECF Nos. 115-1, 121-6); *see* SUMF ¶ 6; RSUMF ¶ 6; CSUMF ¶ 1; RCSUMF ¶ 1.) Though the agreement was signed on or about October 16, 2015, the parties agreed to postdate it to November 10, 2015, the date by which Maoli expected his divorce to be concluded. (SUMF ¶ 9; RSUMF ¶ 9.) In an email to his attorney dated October 16, 2015, Rost explains

> What we have is a postdated agreement signed by [Maoli], because he is in the midst of a divorce and he expects it to be concluded before Nov. 10 . . . which is the date he signed the agreement for.[1]
>
> Next he says he is sending an Escrow Check to Bob Bass for the deposit of $500,000 which I assume is also postdated. Obviously, not where I want to be . . . not what I expected. However, I still believe he is a real buyer . . . . Now for the major hurdle and I don't know if we should wait to see if we have a bona fide deal or act on it now.
>
> [Maoli] says he cannot provide a personal guaranty for the $2.5 mil that I am carrying as a result of his divorce and that he can't show the liability. This is totally a dealbreaker, unless you get together with Bob Bass and can get me a guaranty from Lexus Rt. 10, that is the entity of Lexus Rt 10 that segregates the $2.5 mil so that it is not encumbered . . that's the jailhouse lawyer in me. I really don't want or need anyother [sic] surprises.[2]

---

[1] None of the filings address when Maoli's divorce was concluded and the injunction lifted.
[2] Rost avers that "the parties contemplated that $2.5 million of the $8 million purchase price would be in the form of a loan from Mohegan to Celebrity in exchange for a note of the same amount with a three-year repayment period. In that event, Celebrity would possess both the business and would retain $2.5 million of the $8 million purchase price. Ultimately, the parties

4

> I don't whether [sic] you should act on it now . . though I think we should and what course to take. Tom "assures" [the Broker], that he will come up with a guaranty that will put any fears I have to rest . . . .

("APA Email" ECF Nos. 110-7, 121-7.)

### B. Undisputed Facts Regarding the Dissolution of the Transaction

By letter dated May 3, 2016, Celebrity served written notice terminating the APA invoking Section 8.1(h). ("Termination Letter" (ECF Nos. 110-9, 117-6, 121-12).) Maoli avers that Celebrity terminated the APA because during the due diligence period, Celebrity learned, among other things, that the financial statements provided by Mohegan did not reflect Mohegan's true financial status. (Maoli Decl. ¶ 5.) For example, Mohegan's "adjusted" 2015 year-end financial statement, provided to Celebrity in March 2016 showed a decrease in Mohegan's 2015 "Net Profit" of $253,755 (or 30%), from the "Net Profit" of $849,549.00 recorded in Mohegan's January 2016 financial statement. (Maoli Decl. ¶¶ 6-7 (citing Exhibit C ("Net Profit" line 84 on page 2) and Exhibit D ("Net Profit" line 84 on page 2).) In addition, Mohegan's adjusted year-end 2015 financial statement also recorded as "Standard Bonus – Revenue" of $600,857.00 but Rost acknowledged that this nearly $600,000 is not "income" but money that Mohegan believed Audi owed to it and which was the subject of a lawsuit by Mohegan against Audi. (Maoli Decl. ¶¶ 3-4 (citing Exhibit C at page 2, line 66; Exhibit E at page 3).) Because of the foregoing, Maoli contends that Mohegan operated at a loss in 2015, not with a year-end "Net Profit" of $595,794, which was already 30% less than the profit previously disclosed in the January 2016 financial statement. (Maoli Decl. ¶ 11.)

### C. Relevant Provisions of the APA

---

agreed that Celebrity would pay the full $8 million purchase price at the closing. Mohegan therefore no longer needed a guaranty for the $2.5 million since it was no longer going to be held back." (Rost Decl ¶ 11.)

The introductory paragraph of the APA defines the "Effective Date" as "the date of the last signature to this Agreement" (APA, at 1), which is November 10, 2015 (APA, at 39).

Section 3.5(a) provides in relevant part: "Within 3 business days of the Effective Date, the Purchaser shall deliver to the Escrow Agent the amount of Five Hundred Thousand and 00/100 Dollars ($500,000)." (APA, at 12.)

Section 6.2 provides, in relevant part, " (a) The Seller and Shareholders, jointly and severally, agree to defend, indemnify and hold harmless the Purchaser and its respective officers, directors, managers, members, successors, assigns, employees, agents and representatives (collectively, the "Purchaser Indemnitees") from, against and in respect of, any and all Proceedings, charges, complaints, claims, demands, diminution in value, judgments, liabilities, losses, fines, penalties, violations, amount paid ns settlement, Taxes, costs, damages, expenses or payments, including court costs and reasonable attorneys' fees and expenses (collectively "losses"), incurred or suffered by any Purchase Indemnitee arising from or in connection with: (i) an misrepresentation or breach of any warranty of the seller or the Shareholders made or contained in this agreement; (ii) any failure of the Seller or the Shareholders to perform any covenant or agreement made or contained in this Agreement or fulfill any obligation in respect thereof … (c) In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement or the Other Agreements (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") as soon as practicable after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought…" (APA, at 25-26.)

Section 9.12 provides, "Should any Party institute any suit, action, or Proceeding in court or otherwise to enforce or interpret this Agreement by reason of or with respect to an alleged breach of any provision hereof, the prevailing party shall be entitled to receive from

the non-prevailing party such amount as the court may judge to be reasonable attorneys' and paralegals' fees for the services rendered to the prevailing party in such action or Proceeding, plus the prevailing party's costs and expenses therein, regardless of whether such suit, action, or Proceeding is prosecuted to judgment." (APA, at 38.)

The APA contains a choice of law provision selecting New York. (APA at 36.)

## II.     Procedural History

Mohegan filed this action on August 25, 2016 alleging breaches of contract and of the covenant of good faith and fair dealing against Maoli by way of alter-ego liability and against Celebrity directly, and alleging fraud against Maoli. (ECF No. 1.)

Celebrity and Maoli moved to dismiss. (ECF No. 24.) The Court granted the motion in part, dismissing Mohegan's claim for breach of the covenant of good faith and fair dealing, and denying the motion as to the remaining claims. (ECF No. 35.) Specifically, the Court held that Mohegan had alleged (1) sufficient facts to state a claim for alter-ego liability where Celebrity's ability to perform under the APA was dependent upon Maoli's finances and ability to do so, (2) that Maoli had a duty to disclose that the divorce court had enjoined him from acquiring or selling any businesses or real or personal property during the pendency of the divorce action unless agreed to by the parties with court approval, and (3) under the superior knowledge doctrine, it was appropriate to proceed with side by side claims of fraud and breach of contract. (*Id*.)

Celebrity and Maoli filed an amended answer to Mohegan's complaint and asserted a counterclaim against Mohegan and a third-party claim against the Rosts for breach of contract and contractual indemnification. ("Counterclaim" ECF No. 78.) Celebrity and Maoli allege that the Seller breached the APA by misrepresenting Mohegan's 2015 Net Profits in its financial statements, and, further, that this lawsuit, which names both Celebrity and Maoli violates

7

Section §8.2(a) of the APA. Mohegan and the Rosts answered the counterclaim and third-party complaint. (ECF No. 80.)

Celebrity and Maoli have moved for summary judgment in their favor, averring that (1) there is no evidence from which a reasonable jury could conclude that (A) Celebrity is Maoli's alter ego or (B) that Maoli used Celebrity to commit a fraud or other injustice; and further that (2) Mohegan's breach of contract claims are barred by its failure to mitigate. (ECF No. 105.)

Mohegan opposed Celebrity and Maoli's motion filed a cross-motion for summary judgment, averring that (1) Maoli used Celebrity to fraudulently induce the Seller into the APA and then to secure repeated extensions of the Due Diligence period on false pretenses, and (2) the Court must dismiss Celebrity and Maoli's breach of contract claim because they have failed to prove any injury where Maoli testified only that he was denied financing for the acquisition of another dealership because of the contingent liability created by the existence of this lawsuit. (ECF No. 112.)

On September 9. 2021, the Court denied Defendants' motion for summary judgment as to Mohegan's alter ego liability, fraudulent inducement, and breach of contract claims and granted Plaintiff's cross-motion for summary judgment as to the Buyer's breach of contract claim against the Plaintiff. (ECF No. 122.)

**LEGAL STANDARD**

I.  **Federal Rule of Civil Procedure 60(a)**

Rule 60(a) provides that, "[c]lerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party." District courts have considerable discretion in modifying their judgments under Rule 60(a) based on their subjective assessment as to whether their intentions are reflected accurately in the record. *See Ferguson v. Lion*

*Holding, Inc.*, 2007 WL 2265579, at *3 (S.D.N.Y. Aug. 6, 2007). The "heart of the distinction between an error that is correctable under Rule 60(a) and one that is not is that a correction under Rule 60(a) cannot alter the substantive rights of the parties, but rather may only correct the record to reflect the adjudication that was actually made." *Dudley ex rel. Estate of Patton v. Penn–America Ins. Co.*, 313 F.3d 662, 675 (2d Cir. 2002). Rule 60(a) is not "meant to provide a way for parties to relitigate matters already decided, to change errors in what a court has deliberately done, or to attempt to establish a right to relief which the court has not previously recognized." *Peyser v. Searle Blatt & Co.*, Ltd., 2003 WL 1610772, at *1 (S.D.N.Y. Mar. 24, 2003) (internal quotation marks and citations omitted).

"In sum, then, Rule 60(a) allows a court to clarify a judgment in order to correct a failure to memorialize part of its decision, to reflect the necessary implications of the original order, to ensure that the court's purpose is fully implemented, or to permit enforcement." *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 956 F.Supp.2d 402, 410 (E.D.N.Y. 2013) (internal quotation marks omitted). But the rule "does not allow a court to make corrections that, under the guise of mere clarification, reflect a new and subsequent intent because it perceives its original judgment to be incorrect. Rather, the interpretation must reflect the contemporaneous intent of the district court as evidenced by the record." *Head Start*, 956 F.Supp.2d at 410 (internal quotation marks and citations omitted).

## DISCUSSION

### I. Plaintiff's Motion is Best Construed as Being Made Pursuant to Federal Rule of Civil Procedure 60(a)

Although the Court granted Plaintiff's cross-motion for summary judgment seeking to dismiss Defendants' breach of contract and indemnification crossclaims, the Court did not explicitly include language that Defendants' indemnification crossclaim was dismissed nor detail its rational for such dismissal. (*See* ECF No. 122, at 35-36.) Plaintiff has filed a motion

*in limine* requesting that the Court clarify that Defendants no longer have an affirmative case to be tried, on the basis that the Court's dismissal in its Opinion of Defendants breach of contract claim for failure to adduce evidence of lost profits necessitated the dismissal of their indemnification claim. (ECF No. 165, at 2.)

However, the purpose of a motion *in limine* is to enable the Court to rule on disputes over the admissibility of discrete items of evidence, not to request clarification that the Court confirm a party's claim has been dismissed. *See TVT Records v. Island Def Jam Music Grp.*, 250 F.Supp.2d 341, 344 (S.D.N.Y.2003); *see also United States v. Chan*, 184 F.Supp.2d 337, 340 (S.D.N.Y.2002) ("The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence."); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F.Supp.2d 397, 403 (S.D.N.Y.2003); *Rondout Elec., Inc. v. Dover Union Free Sch. Dist.*, 304 A.D.2d 808, 758 N.Y.S.2d 394, 397 (2d Dept. 2003) (agreeing that "a motion *in limine* is an inappropriate substitute for a motion for summary judgment"). Such a request is better addressed through Rule 60(a), which enables a court to *sua sponte* clarify a judgment to "reflect the necessary implications of the original order [and] to ensure that the court's purpose is fully implemented." *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 956 F.Supp.2d 402, 410 (E.D.N.Y. 2013) (internal quotation marks omitted); *see also Tangtiwatanapaibul v. Tom & Toon Inc.,* No. 1:17-CV-00816 (KHP), 2021 WL 3774310, at *6 (S.D.N.Y. Aug. 24, 2021), aff'd, No. 20-3852, 2022 WL 17574580 (2d Cir. Dec. 12, 2022). Thus, the Court will now clarify pursuant to Rule 60(a) why Defendants' claim for contractual indemnification should be dismissed in order to reflect the necessary implications of its Opinion. *See Head Start*, 956 F.Supp.2d at 410.

## II. Defendants' Breach of Contract and Indemnification Claims Rest on the Same Alleged Underlying Conduct— Misrepresentation of Income

The Court concluded in its Opinion that Defendants failed to raise an issue of triable fact that they suffered damages from Plaintiff's alleged misrepresentation of income, and it thereby dismissed Defendants' breach of contract claim that was premised on this alleged misrepresentation. (ECF No. 122, at 35.) Specifically, the Court found that Defendants failed to create a dispute of material fact that "financing [for a Toyota dealership Defendant Maoli wished to purchase] was denied because of the Seller's [alleged misrepresentation of income] or this litigation" (*See* ECF No. 122, at 34-35.) The Court recognized in its Opinion that Defendants' indemnification claim was likewise premised on the allegation that Plaintiff breached the APA when it purportedly misrepresented its income. (ECF No. 122, at 16.) As discussed *infra*, it follows that the Court intended to dismiss Defendants' indemnification claim alongside its dismissal of their breach of contract claim.

## III. Defendants' Indemnification Claim is Dismissed to Reflect the Intentions of the Court's Opinion

In this Circuit, "[o]rdinarily, a claim for contractual indemnification only accrues once the party that would receive the indemnity has suffered a loss." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 188 (2d Cir. 2014); *see Cont'l Cas. Co. v. Stronghold Ins. Co.*, 77 F.3d 16, 19 (2d Cir.1996) (stating that a claim founded on an express contract for indemnity against loss "generally accrues when the indemnitee actually suffers a loss"); *see also Schneider v. Nat'l R.R. Passenger Corp.*, 987 F.2d 132, 138 (2d Cir.1993) ("A party must sustain a loss in order to assert an indemnification claim."). Defendants' claim for indemnification was, therefore, rendered meritless by the Court's dismissal of its breach of contract claim. As noted *supra*, the Court found that Defendants did not suffer a loss from the conduct on which Defendants' indemnification claim rests— Plaintiff's alleged

11

misrepresentation of income.³ Accordingly, pursuant to Rule 60(a), Defendants' claim for indemnification is dismissed for failure to create a dispute of material fact that they suffered a "loss" for which Plaintiff must indemnify them, in order to reflect the necessary implications of the Court's Opinion.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion *in limine* is GRANTED, to the extent the Court construes it to be a motion made under Rule 60(a) to clarify the Court's prior Opinion. Pursuant to Rule 60(a), the Court confirms that Defendants have no affirmative claims to be tried and thus Defendants' claim for contractual indemnification as against Plaintiff is deemed dismissed.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 165.

Dated: January 27, 2023  
       White Plains, New York

SO ORDERED:

_____  
NELSON S. ROMÁN  
United States District Judge

---

³ Defendants also posit that they are entitled to indemnification under Section 6.2 of the APA for the "loss" of attorneys' fees and costs they purportedly bore due to Plaintiff's alleged misrepresentation of its income and consequential breach of the APA. (ECF No. 78, at 15; ECF No. 168, a 7.) Although Section 6.2 of the APA governs indemnification claims and provides that the seller must indemnify the buyer for any "Losses" (a defined term that includes "attorneys' fees") stemming from Plaintiff's breach of the APA, Section 6.2 must be read in conjunction with Section 9.2 of the APA. "Under New York law, courts should read an integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous." *Abakan, Inc. v. Uptick Cap.*, LLC, 943 F.Supp.2d 410 (S.D.N.Y. 2013). Section 9.2 of the APA governs attorneys' fees and clearly establishes that only the "prevailing party" is entitled to receive attorneys' fees. (APA, at 38.) Therefore, Defendants cannot argue that they are entitled to indemnification for the "loss" of attorneys' fees', as they are not entitled to such fees where, as here, the Court dismissed the cause of action on which their claim for such fees is based (i.e., that Plaintiff breached the APA when it misrepresented its income).